In the Matter of the Appraisal, under the Act in Relation to Taxable Transfers of Property, of the Property of MARCUS DALY, Deceased.

THE COMPTROLLER OF THE STATE OF NEW YORK, Appellant; MARGARET P. DALY, Individually, and as Executrix, etc., of MARCUS DALY, Deceased, Respondent.

*Transfer tax — a deposit in bank by a debtor of money to meet the claim of a non-resident creditor is subject to the tax — the creditor has a property right both in the debt due from the debtor and in the deposit — that the deposit is taxable elsewhere is unimportant — a deposit by a non-resident with stockbrokers as a margin is, after the stock transaction is closed, also taxable.*

Marcus Daly, a resident of the State of Montana, died November 12, 1900. November 1, 1900, one Rockefeller, who had borrowed a large sum from Daly and who was desirous of repaying the loan, drew his check to Daly's order for the amount thereof. Daly was then unable to transact any business and remained so until his death. November 7, 1900, Daly's secretary took the check to a bank in which Daly kept an account for the purpose of depositing the check in such account. The check not being indorsed by Daly, the bank declined to receive it for deposit in Daly's general account, but consented to receive and collect the check upon Daly's indorsement by his secretary and to open a special account with Daly for the amount thereof. The latter course was adopted. The facts relating to the opening of the special account were never communicated to Daly and he had no knowledge respecting the matter and gave no directions concerning it. After Daly's death the amount of the special account was received by his estate and was inventoried as money belonging to him at the time of his death.

It further appeared that at the time of Daly's death he had a large sum of money on deposit with a firm of stockbrokers; that this money had originally been delivered to the stockbrokers to margin stock transactions; that the stock transactions had been closed, and that the money was held by the stockbrokers subject to Daly's control and payable to him on demand; that if Daly made no use of it, the stockbrokers were authorized to use it in their business, paying him interest thereon; that Daly made no use of the sum, but that the stockbrokers did. Daly had no bank book showing the amount of such deposits, nor any checks to draw upon the stockbrokers.

Both Rockefeller and the members of the firm of stockbrokers were residents of the State of New York, and were concededly solvent.

*Held*, with respect to the special account in the bank, that an obligation rested upon the bank to hold the deposit subject to Daly's order and to pay it to him upon his demand unless Daly disaffirmed the transaction, in which event the bank's obligation and liability would have been to Rockefeller;

That, consequently, Daly had a property right both in the debt due from Rockefeller to him and in the money held by the bank;

That Daly having died without affirming or disaffirming the transaction and his estate having received the special deposit as money due from the bank, the law would also treat it as such, and hence as subject to a transfer tax in the State of New York;

That the fact that this sum had also paid a transfer tax to the State of Montana and to the Federal government did not prevent it from being subject to a transfer tax in the State of New York;

That the indebtedness from the stockbrokers to Daly created by his deposit with them was not other or different than that which would exist between the bank and Daly if he had made the deposit in an ordinary bank of discount, and that, consequently, the deposit with the stockbrokers was also subject to a transfer tax in the State of New York;

That, assuming that the special account in the bank and the deposit with the stockbrokers were to be treated as debts in the ordinary sense due to Daly from Rockefeller and the stockbrokers, they constituted " property within the State " of New York within the meaning of the Transfer Tax Law, for the reason that debts due within the State of New York from solvent debtors, and which are actually converted into money in such State, are to be treated as property having its situs in the State of New York, and, therefore, property subject to the transfer tax.

INGRAHAM, J., dissented.

APPEAL by the Comptroller of the State of New York from an order of the Surrogate's Court of the county of New York, entered in said Surrogate's Court on the 17th day of February, 1904, vacating and setting aside a previous order of said Surrogate's Court fixing the amount of a tax to be assessed under the act in relation to taxable transfers, and remitting to the appraiser the report theretofore filed by him for further consideration and report.

*Frank S. Black*, for the appellant.

*John M. Bowers*, for the respondent.

HATCH, J.:

The facts of this case are not in dispute. Marcus Daly, a resident of the State of Montana, died in the city of New York on the 12th day of November, 1900, leaving a last will and testament, which were duly admitted to probate in Montana on the 19th day of January, 1901, and letters testamentary were issued in that State to his widow as sole executrix. At the time of the death of the testator he was the owner of considerable personal property situate within

this State, consisting of a lease of real estate and deposits in banks, subject to his personal check. The property, the right to tax which is involved in this appeal, consists of two items, and the questions presented thereby arise out of the following facts: In September, 1899, the testator loaned to William G. Rockefeller $2,000,000. Upon the 1st of November, 1900, there was due upon this debt of principal and interest $1,300,518.91. Rockefeller desired at that time to discharge the whole debt. He had rendered a statement to Daly prior thereto showing the balance remaining due and unpaid with interest. On that date Daly was incapacitated from transacting any business or holding any negotiations with respect thereto by reason of a serious illness and so remained until his death. Rockefeller drew his check, bearing date on that day, for the whole amount of the indebtedness and delivered the same to his secretary with instructions to use it in discharge of the debt. Seven days thereafter the check was delivered to Mr. John C. Lalor, the secretary of Daly. He took the same to the National City Bank, where Mr. Daly kept an account, for the purpose of depositing the same in Daly's account. The bank, upon being informed of the circumstances, refused to receive the check for deposit in the general account of Daly. They consented, however, to receive and collect the check upon Daly's indorsement by Lalor, and opened a special account with Daly for the amount. The transaction took this form: Lalor indorsed the check and the bank opened an account headed " Specl. a/c " and gave Daly credit therein for the amount. This deposit was made November 7, 1900, and it remained in this condition at the time of Daly's death. The latter during this period was incapable of transacting any business, had no knowledge respecting the matter and gave no direction concerning it, nor were the facts at any time communicated to him. In connection with this transaction it was testified by Lalor that it was Daly's intention to use the money to be paid by Rockefeller in the purchase of stock of the Amalgamated Copper Company, a New Jersey corporation, and for the payment of debts which he owed in Montana. It also appeared that interest was paid by the bank amounting to $2,399.34 up to and including June thirtieth. The whole sum was received by the estate of Daly. It was inventoried as money belonging to him at the time of his death in the inventory filed in the State of

Montana, and a tax was assessed and paid upon the same under the laws of that State and also to the Federal government under its laws.

The second contested item involves the sum of $263,270.11. As appears by the affidavit of Benjamin C. Van Dyke this sum of money was on deposit with the firm of Flower & Co., bankers and brokers, the item being made up of $250,000 principal and $13,270.11 interest up to and including November 12, 1900. Daly had dealt with Flower & Co. as brokers, and in that relation delivered to them $250,000 to margin stock transactions. The stock purchased had been closed out and this sum was held by Flower & Co. for Daly, subject to his further instructions as to buying stock or whatever else he saw fit to do with it. If he made no use of it Flower & Co. were authorized to use it in their business and so long as it remained with them unused by Daly they paid interest upon the same. Daly never made use of it; Flower & Co. did. Daly had no bank book showing the amount of this deposit, nor did he have checks to draw upon Flower & Co. The money, however, was subject to his control, was payable on demand or to be used for the purchase of stocks as he might direct. Such was the condition which existed at the time of Daly's death.

If these two sums of money are to be treated as cash on hand, subject to Daly's order at the time of his death, then they were taxable within the rule announced in *Matter of Houdayer* (150 N. Y. 37) and *Matter of Blackstone* (69 App. Div. 127; affd. on appeal by the Court of Appeals, 171 N. Y. 682, and by the Supreme Court of the United States, *sub nom. Blackstone* v. *Miller*, 188 U. S. 189). It may be conceded that the money due from Rockefeller to Daly was a debt, and that the transaction which resulted in this sum of money being placed in the bank and credited to Daly as money, subject to his order, would not have the effect of relieving Rockefeller from liability upon the original debt if Daly after knowledge of the facts chose to disaffirm the transaction. Under such circumstances it is probably true that the bank would retain the moneys as trustee for Rockefeller, and had the bank failed at any time prior to Daly's taking any action, the loss would have fallen upon Rockefeller. It is equally true that the bank would not have been justified or protected in paying this money to Rockefeller before any action had been

taken by Daly. If it had delivered it to Rockefeller and he had failed without discharging his debt to Daly, the bank would undoubtedly have been liable to the latter in this sum. The obligation which rested upon the bank as it had received the money, was to hold it subject to Daly's order and pay it to him upon demand, unless he disaffirmed the transaction, in which event its obligation and liability would have been to Rockefeller. This being the relative situation of the parties and their rights arising out of the transaction, we are called upon to determine whether the property right of Daly is to be regarded as being solely in the debt due from Rockefeller to him, or whether the situation had so far changed that Daly's property right was in the money held by the bank. We think it was in both. He could treat the transaction as a payment of his debt, or he could disaffirm it and demand payment of Rockefeller. Evidently he could not do both. He could do either one or the other. As he died, he did neither. It is well settled that the tax is imposed upon the transfer and for purposes of taxation the assessment is to be made upon the property transferred as the testator leaves it. (*Matter of Sutton*, 3 App. Div. 208; affd. on appeal on opinion below, 149 N. Y. 618.) The transfer herein as matter of fact has been of the money on deposit in the bank, and the debt of Rockefeller has been regarded as discharged. It was so discharged when the money was taken. It was subject to Daly's order, either by check or otherwise when he died, and it is admitted that his estate took it as money due from the bank. It could be so transferred as such, and Daly so left it in this condition when he died, whether intentionally or otherwise. For purposes of taxation the law lays hold of it as it is found, and being found as money and transferred as such, it is to be regarded as money for purposes of taxation. It was, therefore, erroneous to consider it as a debt and exempt it from taxation. The fact that this sum also paid tax in the State of Montana and to the Federal government is no objection to its being taxed here. (*Matter of Blackstone, supra.*)

We also think that the item in the hands of Flower & Co. is subject to the same rule. This transaction does not vary in any degree from the ordinary custom which obtains with bankers and brokers and their customers. The evidence of the cashier of Flower & Co. states the character of the firm. His language is " that on Novem-

ber 12, 1900, Marcus Daly had on deposit with the firm of Flower and Company cash to the amount of $263,094.71, and with the accrued interest thereon to the said 12th of November, 1900, amounted to the sum of $263,270.11." The testimony of Lalor, the secretary of Daly, respecting this deposit, reads : It "represents an original payment, or $250,000 originally turned over to Flower & Co. as margin on a stock purchase, which was closed out, and the accrued interest brought it up to $263,094.71, which amount was due Mr. Daly or subject to his further instruction as to buying more stock or whatever he saw fit to do with it on November 12th." It is true that he in terms states that it was a debt owing by Flower & Co., but this statement is a mere conclusion. The transaction speaks for itself. It was the usual and customary deposit of money with stockbrokers and bankers to be used for the benefit of the customer. It was at all times subject to Daly's order. He could have drawn it out or directed its application to the purchase of stocks, or otherwise disposed of it. It was in Flower & Co.'s hands as money deposited by Daly. It was as much subject to his control and direction as though it had been placed in a trust company. The indebtedness created thereby on the part of Flower & Co. was not other or different than the indebtedness which would exist between the bank and Daly had he deposited it in an ordinary bank of discount. The use which Flower & Co. made of the money thus placed on deposit in their business did not operate to change such relation. It was precisely the same use that is made of the money of depositors in an ordinary bank in the business carried on by it. These moneys are used in discounting the paper of customers, and for various other purposes connected with the banking business. The fact that it is so used does not destroy the right of the depositor to obtain his money upon demand, or direct its disposition. Nor did the payment of interest upon it change such relation. It was interest which accrued under similar conditions, and is precisely the same in result as though the money had been deposited in a trust company. Flower & Co. were bankers and received this money on deposit to be made use of as Daly should direct. They held it at all times subject to his order, and were bound to obey his directions concerning it whenever he gave them. The indebtedness, therefore, was the same as obtains between a bank and its depositor. In

technical sense it undoubtedly was a debt, but within the authorities first above cited, for purposes of taxation it is regarded as money on hand, due to the depositor and subject to his order. It was transferred as such to this estate, and is, therefore, taxable.

Assuming, however, that these sums of money be treated as debts in the ordinary sense due from Rockefeller and from Flower & Co., we think they constituted property within the meaning of the Transfer Tax Law and the policy of the State with respect thereto. By the provisions of section 220 of the Tax Law (Laws of 1896, chap. 908, as amd. by Laws of 1897, chap. 284), so far as is essential to a consideration of the questions involved in this appeal, it is provided : "A tax shall be and is hereby imposed upon the transfer of any property, real or personal, of the value of five hundred dollars or over, or of any interest therein or income therefrom, in trust or otherwise. * * * 2. When the transfer is by will or intestate law, of property within the State, and the decedent was a nonresident of the State at the time of his death." It is undisputed that the transfer in this case was by will; that the testator was a non-resident of the State at the time of his death, and the subject-matter of the transfer was a debt payable by admittedly solvent persons residing within this State at that time. That debts constitute property cannot be gainsaid. In what it consists has been variously defined. Thus in *Ayers* v. *Lawrence* (59 N. Y. 192, 198) ALLEN, J., said : "The word 'property' denotes the interest one may have in lands and chattels to the exclusion of others." In *Hamilton* v. *Rathbone* (175 U. S. 414) it was said : "The word 'property' * * * is broad enough to include everything which one person can own and transfer to another." In *Carlton* v. *Carlton* (72 Me. 115) the court said : "The word 'property' includes choses in action as well as choses in possession. It includes money due as well as money possessed. * * * In its broadest sense it includes everything which goes to make up one's wealth or estate." (*Powell* v. *Waldron*, 89 N. Y. 328.) In *Matter of Hellman* (174 N. Y. 254) it was said, in speaking of this section of the statute : "All property having an appraisable value must be considered, whether it is such as might be taxed under the general law or not." And it was there held that the value of a seat in the New York Stock Exchange was property and subject to the Transfer Tax Law.

There can be no doubt but that a debt is property within the meaning of this statute. It is clearly included within the definition of property contained in section 242 of the Tax Law (as amd. by Laws of 1898, chap. 88), and was so construed by authority. (*Matter of Hellman, supra.*) Being property, the question to be decided is, " Is it property within this State ?" This is no longer a question to be determined by process of reasoning or argument. That has already been exhaustively done. (*Matter of Bronson*, 150 N. Y. 1; *Blackstone* v. *Miller*, 188 U. S. 189.) Its solution depends upon authority, if we can find what the effect is of the adjudicated cases bearing upon the subject. In *Matter of Bronson* (*supra*) the question before the court, and which was considered and decided, was as to whether a debt due from a resident of this State to a non-resident had its situs at the place of the creditor or the debtor, and it was there held that the situs of such debt was the residence of the creditor, and although the same was due and payable in this State, it did not constitute property within the State. In this respect, as we have already seen, a distinction was made between money held, subject to the order of the deceased, which, although admitted in technical sense to be a debt, yet within the policy of the Tax Law it was not so to be regarded, but was to be treated as money on hand. The distinction is narrow. In *Matter of Hellman* (*supra*) the decision clearly indicates that the policy of the Transfer Tax Law is to bring within its terms all species of property. This view also finds support in the cases to which we first called attention. In *Blackstone* v. *Miller* (*supra*) the Supreme Court of the United States considered this question and the policy of this law. That case passed through this court. Therein the decision was made to rest both in this court and in the Court of Appeals upon the determination made in the *Houdayer Case* (*supra*). The Supreme Court of the United States supported the decision and upheld the act and the tax under it, but upon entirely different grounds from the reasons adopted by the Court of Appeals in the *Houdayer Case*. Therein the court held that the situs of the debt at the place of residence of the creditor, where the debtor resided in a foreign jurisdiction, was based upon a fiction of law, well understood and historically traceable, but that in fact the situs of the debt was at the place of residence of the debtor, because the

creditor in order to compel payment of the debt and receive the money was required to invoke the jurisdiction and the laws of the foreign State; that being compelled to resort to the judicial forum in such State to enforce his rights, the debt within the policy of this statute was to be regarded as due to the creditor at the place where the debtor resided, and where alone he could be compelled to make payment, and that under such circumstances the fiction of the situs of the debt as of the residence of the creditor could not obtain as against the policy of the State in imposing the tax. The construction of this statute, here the subject of consideration, was necessarily involved in that decision, and not only was it so necessarily involved, but it was a determination of the construction of the act placed upon it by the courts of this State. The authority is, therefore, to be regarded as adopting the construction which had been announced both before and since by the courts of this State as to the intent and policy of this statute. The able and lucid opinion written by Mr. Justice HOLMES, in delivering the opinion of the court in the *Blackstone* case, leaves nothing to be added to the determination as to the situs of the debt, and it is evident to a demonstration that the fiction of law which ordinarily fixes such situs should be made to yield. In the construction of State statutes the Supreme Court of the United States is required to adopt the construction placed upon them by the State courts, and the latter construction by the Court of Appeals of this State is binding not alone upon the Supreme Court of the United States, but also upon tribunals inferior thereto within the State. We think there is no infringement of this rule in holding that for purposes of taxation the situs of the debt is at the place of residence of the debtor, for the reason that in the *Blackstone* case the construction of this statute was before both courts, both have agreed upon the policy of the State respecting property which could properly be made the subject of taxation, and both have announced the policy of the State respecting such subject. Under such circumstances the reasoning of the Supreme Court of the United States becomes controlling and proceeds somewhat beyond a determination that the State has the constitutional right to tax debts. It not only determined that question affirmatively, but it also determined that under the statute as it then existed debts were

FIRST DEPARTMENT, JANUARY, 1905.          [Vol. 100.

taxable. In the *Bronson Case (supra)* it was held that they were not so taxable, because they were not property within the State. When that doctrine was exploded by showing that the rule of construction required that fiction should yield to fact, it carried with it the policy of the State as announced by the Court of Appeals, and under such rule it became the construction of the statute. The continuous tendency of the courts of this State has been to embrace within the Transfer Tax Law directly or indirectly all property of every species found herein upon the death of the decedent. That policy and rule has never been departed from or infringed upon, save by the application of what the court regarded as an inexorable rule of law, which upon thorough examination turns out to be a fiction. When that fact appeared, and the statute is the subject of construction wherein it is made to appear, it becomes controlling not only as an adjudication of the highest court of the land, but also as an adjudication of the construction adopted by the courts of this State. It is not so much a difference of construction as it is of reason producing it, and when the reason for a given construction is shown to fail, and the policy of the statute is clear, the adjudication of the United States court becomes supreme and is made the law of the land with respect to the particular questions involved. Under these circumstances, we think its rule must obtain, and so obtaining it, necessarily follows that debts due within this State from solvent debtors, which are converted into money herein, and must of necessity be enforced in this jurisdiction, or not at all, become property within the meaning of the Tranfer Tax Law, and as such are taxable.

These views necessarily lead to the conclusion that the order of the surrogate refusing to confirm the report of the referee should be reversed, with ten dollars costs and disbursements, and the motion to confirm granted.

VAN BRUNT, P. J., O'BRIEN and MCLAUGHLIN, JJ., concurred; INGRAHAM, J., dissented.

INGRAHAM, J. (dissenting):

I do not concur with Mr. Justice HATCH. He concedes that the Court of Appeals of this State has held that a debt due by a resident of this State to a non-resident has its situs at the domicile

of the creditor, and although the same was due and payable in this State it does not constitute property within this State (*Matter of Bronson*, 150 N. Y. 1); but he holds that we should reverse this decision of the Court of Appeals because the Supreme Court of the United States has held that a statute treating such a debt as property within the State which was the domicile of the debtor was not in violation of any provision of the Federal Constitution. What was said by the Supreme Court of the United States had relation to a deposit by a non-resident in a trust company created by the laws of this State, doing business within this State and having its assets here. In this State the distinction between a deposit in a bank or trust company, where the amount deposited is payable on demand, is distinguishable from a debt due to a non-resident where the sole right of the creditor in case the debtor refuses to pay is to collect by the usual judicial proceedings. With the soundness of this distinction we have nothing to do. It is firmly established, and nothing that was said by the Supreme Court of the United States in *Blackstone* v. *Miller* (188 U. S. 189) has any relation to this distinction. Mr. Justice Holmes, in that case, says: " Therefore, the naked question is whether the State has a right to tax the transfer by will of such deposit." In discussing that question he said : " If the transfer of the deposit necessarily depends upon and involves the law of New York for its exercise, or, in other words, if the transfer is subject to the power of the State of New York, then New York may subject the transfer to a tax. * * * But it is plain that the transfer does depend upon the law of New York, not because of any theoretical speculation concerning the whereabouts of the debt, but because of the practical fact of its power over the person of the debtor. * * * What gives the debt validity ? Nothing but the fact that the law of the place where the debtor is will make him pay. * * * Power over the person of the debtor confers jurisdiction, we repeat. And this being so, we perceive no better reason for denying the right of New York to impose a succession tax on debts owed by its citizens than upon tangible chattels found within the State at the time of the death." In *Matter of Bronson* (*supra*) it was expressly held that under the laws of this State the State has no jurisdiction over the right of succession which accrues under the law of a foreign State. Judge

GRAY there says: "The decedent was a creditor to whom. the obligors in the various bonds were indebted; the extent and terms of whose obligation were evidenced by those bonds. The legal situs of the indebtedness was at the creditor's domicile, and as the actual situs of the bonds themselves was also there, upon no theory can it be held that the. provisions of the Transfer Tax Act could reach them in its operation. The logical result of the proposition which has been established, that the tax is upon the right of succession to property, is, in my opinion, to confine the operation of this law, where non-residents' estates are concerned, to cases of property having a tangible and visible existence, and being the actual subject of the ownership." In *Matter of Houdayer* (150 N. Y. 37), decided at the same time as the *Bronson* case, the court held that a deposit of money in a bank, though technically a debt, is money for all practical purposes, and as such is taxable under the Transfer Tax Law.

Applying the principles established by these cases, it seems to me that the property upon which the State has assumed to impose a tax was nothing but a debt at the death of the testator and thus not taxable. The amount on deposit in the City Bank was not at the time of his death the property of the decedent. It was not so treated by the bank, but it was money that had been deposited by a debtor in discharge of his obligation to the decedent, but never having been accepted by the decedent, or tendered to him, it was not at the time of his death his money. The debtor still owed the decedent the amount of indebtedness, and if he saw fit to deposit the money in the bank to pay the debt when the creditor called upon him for it, it was for the convenience of the debtor, not the creditor, and so the amount due to the creditor from the firm of Flower & Co. was not a deposit in a bank or trust company subject to the order of the decedent, which was in effect money in his possession. The money had been deposited with Flower & Co. as margin in a stock transaction. The stock transaction having been completed, Flower & Co. owed the decedent the amount that the deceased had deposited, but the relation between Flower & Co. and the decedent was simply that of debtor and creditor. Flower & Co. were under no obligation to respond to a draft drawn upon them by the decedent, and would have incurred no liability for refusing to honor such draft. The substantial difference between a deposit

account and a simple indebtedness, which induced the Court of Appeals to hold that a deposit in a bank or trust company was practically money, while the indebtedness of a resident of this State to a non-resident was not, requires us, I think, to hold that this indebtedness of Flower & Co. was not property in this State over which this State had jurisdiction, a distinction which has not been at all affected by the decision of the Supreme Court of the United States in *Blackstone* v. *Miller* (*supra*). If, however, the Supreme Court of the United States had expressly disagreed with the Court of Appeals of the State of New York upon the construction of a New York statute, we should still follow the decision of the Court of Appeals.

I think the order appealed from should be affirmed.

*Order reversed, with ten dollars costs and disbursements, and motion granted.*